## UNITED STATES v. TWO SOAKING UNITS AND VARIOUS OTHER ARTICLES.

### Claim of EXCELSIOR BREWERY, Inc., et al.

### No. 2554.

District Court, E. D. New York.

Oct. 20, 1930.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (J. Bertram Wegman, Asst. U. S. Atty., of New York City, of counsel), for libelant.

Louis J. Castellano, of Brooklyn, N. Y. (Louis J. Castellano and Harold L. Cowin, both of Brooklyn, N. Y., of counsel), for claimants.

GALSTON, District Judge.

This matter comes before the court on motion to vacate the attachment made upon the process issued under this libel, and to dismiss the libel.

The libel seeks a forfeiture of certain cereal beverages, malt tonic, barreled goods, malt syrup, refrigerated foodstuffs, barrels of beer having alcoholic content of one-half of one per cent. or more by volume, hops, grits, practically all of the machinery and equipment of eight buildings, constituting the plant of the Excelsior Brewery, Inc., a vast amount of furniture, automobiles, trucks, and miscellaneous supplies, on the ground that such property was unlawfully held and used and intended for use in violation of the Revised Statutes, § 3453 (title 26, U. S. Code, § 1185 [26 USCA § 1185]).

The libel alleges that the aforesaid property was in the possession and control of Excelsior Brewery, Inc., at premises 227–279 Pulaski street in the borough of Brooklyn; that between the 17th day of January, 1930, and the 9th day of August, 1930, Excelsior Brewery, Inc., possessed large quantities of beer containing more than one-half of one per cent. of alcohol by volume, subject to tax pursuant to section 608 of the Revenue Act of 1918 (title 26, U. S. Code, § 506 [26 US CA § 506]); that such beer was so possessed for the purpose of being sold and removed by Excelsior Brewery, Inc., in fraud of the

Internal Revenue Laws and to avoid the payment of taxes due thereunder. The libel also alleges that all the articles and items of personal property listed in the schedule annexed to the libel were found and seized by the prohibition administrator.

Immediately following the filing of the libel, the petitioners, Excelsior Brewery, Inc., and the Pulaski Holding Company, Inc. (the owner of the real estate), filed claims as owners of the property seized, and later a petition for its return and the dismissal of the libel on the ground that the facts as to seizure, set forth in certain affidavits of J. Bertram Wegman, assistant United States attorney, and Joseph L. Kania, inspector for the Bureau of Industrial Alcohol, show that the search and seizure of the property, real and personal, made by the agents of the government on August 9, 1930, were without any warrant or authority in law and in violation of the provisions of the Fourth and Fifth Amendments of the Constitution.

The Wegman affidavit recites that on August 7, 1930, certain police officers of the city of New York had entered a garage at 876 De Kalb avenue, Brooklyn, and had found therein four automobile trucks, each loaded with approximately one hundred and thirty-five beer barrels, and two trucks, upon each of which were loaded a racking machine and equipment for operating them; and that while the officers were in the garage, four more automobile trucks, each containing one hundred and thirty-five beer barrels, had driven into the premises. The officers thereupon arrested seventeen men, presumably in charge of the garage and the trucks. It does not appear from the Wegman affidavit on what charge the men were arrested.

The construction of the garage was such as to prevent any person on the outside from obtaining any view of the interior. There was found to be a pipe set in what appeared to be a water drain in the floor of the garage. The pipe had a hose connection, and adjacent thereto was a hose of the type known as a brewery hose. This hose was connected with a pressure gauge apparatus, which was in turn connected to one of the racking machines. Coupled to and connected with the racker were four tanks of liquid carbonic gas, two of which were apparently still full. The electric current was running through the electric control pump to these carbonic gas tanks. In the vicinity Wegman noticed a number of barrels containing bungs for beer kegs. He detected an odor of beer from the racker machine as well as from the pipe in the drain referred to hereinbefore. It was observed that the angle at which this pipe was set in the ground pointed in the direction of the Excelsior Brewery, which brewery was located on the opposite side of the square block from the garage.

The officials then visited the premises of the Excelsior Brewery. Directly opposite those premises was located another garage on Pulaski street. On arrival at the brewery, William C. Nolan, acting deputy prohibition administrator for this judicial district, demanded of one of the officers of Excelsior Brewery, Inc., the right to make an inspection of the premises. It should be stated that Excelsior Brewery, Inc., held a permit to manufacture cereal beverages. No objection was made by the brewery people to the proposed inspection. It was ascertained from one Milford Mandel, the vice president and secretary of Excelsior Brewery, Inc., that the garage opposite the brewery was owned by the Pulaski Holding Company, Inc., one of the petitioners herein, who also owned the brewery property, and that the officers of the Pulaski Holding Company were his father and brother, his father likewise being the president and treasurer of the brewery corporation.

While the inspection of the brewery was being made (what such inspection revealed is not disclosed in the affidavit), it was found by police officers that there were two drains in the Pulaski street garage similar to that discovered in the De Kalb avenue garage, with the same type of brass pipe outlet in each. From each of these outlets there appeared to be an odor of beer. Mr. Mandel admitted that at one time there had been several pipe lines from the brewery but that they had been disconnected some eight or nine months previously. It was learned that the flooring in the part of the brewery directly opposite the Pulaski street garage was new and had been laid about the middle of July, 1930. One of the pipes in the Pulaski street garage ran up toward the ceiling of the garage and thence was carried toward the rear of the garage. From this overhead pipe was a drop line terminating in a faucet. One of the agents turned a handle of the faucet, and by draining the pipe, obtained about two quarts of a fluid that Wegman avers had every appearance of beer, and which upon analysis was found to have an alcoholic content of 2.89 per cent. by volume.

The investigation on August 7, 1930, also led to the alleged discovery of a pipe connec-

tion between the Pulaski street garage and the De Kalb avenue garage.

On August 9, 1930, a permit having first been obtained from the bureau of highways of the city of New York, the sidewalk in front of the brewery was dug up, and after a hole of approximately three feet in depth was made, it was discovered that there were two brass pipes and a number of other pipes apparently running out of the brewery and across toward the garage. By tapping on the pipe in the garage, a sound was obtained from the pipe directly under the brewery doorway, and the vibration could be felt in the pipe. Thereupon permission of the brewery representatives was sought to dig up the floor in the brewery. Such permission was refused. Thereupon, a representative of the prohibition administrator, according to the Wegman affidavit, announced to those present, including the attorneys for the brewery, "that he was seizing the brewery on behalf of the United States Government, the seizure being based upon section 3453 of the Revised Statutes." The attorneys for the brewery objected to the seizure.

It appears from the Wegman and Kania affidavits that the government first seized the brewery on August 9, 1930, and after the seizure, made the search described with minute particularity (but not with convincing clearness) by the agent Kania, covering the period from August 11th to August 30th. If the attachment is to be justified and the libel stand, it must be because of the seizure on August 9th. If, on the other hand, the seizure on August 9th was unlawful, then the subsequent search was not justified.

Whether the seizure was lawful must therefore be determined, not by the facts set forth in the Kania affidavit, but in the Wegman affidavit. From that affidavit it does appear that in the De Kalb avenue garage the presence of beer trucks, beer barrels, mechanisms for pumping and filling barrels, the odor of beer, and the pipe, indicated an effort on somebody's part to conduct these operations under cover of observation. The connecting beer pipe which ran from the Pulaski street garage is another suspicious circumstance, particularly in view of the fact that contraband beer was found at one terminal of the pipe in the Pulaski street garage.

How are these suspicious circumstances connected with Excelsior Brewery, Inc.? First, there is the presence of a brass pipe and other pipes running from the garage to the brewery. Secondly, there is the identity of ownership of real property, of the brewery, and the Pulaski street garage. Next there is the significant fact that the officers in control of the company owning the real estate are the officers in control of the brewery. Finally perhaps there was the refusal of the brewery officials to permit the government agents to dig up the flooring of the brewery at the point at which the pipes from the garage were supposed to enter the brewery, and the interference which the brewery officials offered at first to the digging up of the street abutting the brewery property. On the other hand, it must be borne in mind that when, prior to the seizure, inspection of the brewery property was demanded by the prohibition agents because the Excelsior Company was a permittee, consent to such inspection was given. It is significant that the Wegman affidavit reveals nothing of what was observed by the officers who made such inspection. So the seizure on August 9th, as the Wegman affidavit discloses, was of the entire brewery, realty and personalty alike, on the belief by the government agents that the provisions of the Internal Revenue Act, title 26 U. S. Code, § 1185 (26 USCA § 1185), applied. That section reads as follows:

"All goods, wares, merchandise, articles, or objects, on which taxes are imposed, which shall be found in the possession, or custody, or within the control of any person, for the purpose of being sold or removed by him in fraud of the internal-revenue laws, or with design to avoid payment of said taxes, may be seized by the collector or deputy collector of the proper district, or by such other collector or deputy collector as may be specially authorized by the Commissioner of Internal Revenue for that purpose, and shall be forfeited to the United States. And all raw materials found in the possession of any person intending to manufacture the same into articles of a kind subject to tax for the purpose of fraudulently selling such manufactured articles, or with design to evade the payment of said tax; and all tools, implements, instruments, and personal property whatsoever, in the place or building, or within any yard or inclosure where such articles or raw materials are found, may also be seized by any collector or deputy collector, as aforesaid, and shall be forfeited as aforesaid. The proceedings to enforce such forfeiture shall be in the nature of a proceeding in rem in the district court of the United States for the district where such seizure is made. (R. S. § 3453)."

■ It will be noted that the section does not authorize the seizure of real estate but only of personal property. So at least the seizure of the real property by the government agents on August 9th clearly was illegal. At most the government agents, assuming for the moment that they were on the premises legally and that the Internal Revenue Act had been violated, had the right to seize the three classes of property described in the statute. The acts of dominion over the real estate which followed the seizure were wholly unlawful.

■ Was the seizure of the personal property lawful? By what right did the government agents seize that property?

Assuming that the government suspected and had probable cause to believe from the facts set forth in the Wegman affidavit that Excelsior Brewery, Inc., was diverting its real beer to the two garages in the effort to avoid the Revenue Act, was it lawful for the officers to seize the brewery or any part of its contents without first obtaining a search warrant? The only authority that I have found in which the subject is directly discussed is United States v. Fears, Fed. Cas. No. 15080, which holds that section 3177 of the Revised Statutes (title 26, U. S. Code, § 92) authorizes revenue officers to enter any building where articles subject to tax are made or kept, for the purpose of examining said articles or objects, and that they may without process seize illicit distilled spirits. But the officers who made the seizure on August 9th made no such inspection as that indicated in section 3177 before making the seizure. If they did, the Wegman affidavit remains strangely silent as to what they discovered. The only search of the premises which is described was that made after the seizure and covered the period from August 11th to August 30th.

Thus it appears that the government stands solely on the grounds set forth in Revised Statutes, § 3453. There is nothing stated explicitly in that section which authorizes an entry, search, and seizure without process; and it is unreasonable to believe that the section as drawn was intended to avoid the Fourth Amendment to the Constitution. On the contrary, if there is any presumption in the matter, it must be that such was not the intention, for Revised Statutes, § 3462 (title 26, U. S. Code, § 1195 [26 USCA § 1195]) makes specific provision for the issuance of search warrants, when it appears "that a fraud upon the revenue has been or is being committed upon or by the use of the said premises."

I can see no reason why the information set forth in the Wegman affidavit was not laid before a United States Commissioner and application made for a search warrant. Then an orderly search of the premises would have revealed that which is set forth in the Kania affidavit, following which it is possible but by no means certain that a seizure might have been lawful.

■ It follows that the seizure on August 9th was unlawful in toto, and the search which followed, being connected therewith, was likewise unlawful.

It may be pertinent to note that when certain aspects of this matter were before Judge Byers in the equity suit brought by the petitioners to enjoin the government on a motion for a preliminary injunction, he wrote [1]:

"Without passing upon the legality of the seizure of August 9th, 1930, which seems to be open to serious question, the defendants are directed to institute in this court the proceedings contemplated by 26 USCA § 1185, on or before September 22, 1930, and in the event that no such proceeding is instituted the complainants herein may make any application of which they may be advised on two days' notice to the defendants. Submit order forthwith."

■■ To sustain a libel for forfeiture, property must be in possession of the government under a lawful seizure. United States v. Certain Malt, etc. (D. C.) 23 F.(2d) 879; Talent v. U. S. (C. C. A.) 32 F.(2d) 630. A search must be justified not by what is found, but on the steps which precede it. United States v. Rembert (D. C.) 284 F. 996, 999, quoting from United States v. Slusser (D. C.) 270 F. 818, 819:

"An unlawful search cannot be justified by what is found. A search that is unlawful when it begins is not made lawful when it ends by the discovery and seizure of liquor. It was against such crime, on the chance of discovery, that the constitutional amendment was intended to protect the people."

It is true that in United States v. Various Items of Personal Property (C. C. A.) 40 F.(2d) 422, 423, it is said:

"But we need not pass upon the merits of this argument, because, if the seizure were illegal, the government could adopt it for purposes of a libel of forfeiture."

---

[1] Memorandum on motion papers.

But read with the context it would seem that that language merely means, as was said in United States v. One Ford Coupe, 272 U. S. 321, at page 325, 47 S. Ct. 154, 155, 71 L. Ed. 279, 47 A. L. R. 1025:

"It is settled that, where property declared by a federal statute to be forfeited, because used in violation of federal law, is seized by one having no authority to do so, the United States may adopt the seizure with the same effect as if it had originally been made by one duly authorized."

Applying that law to the present case, I take it that it means merely that the petitioners here could not have objected to the legality of the seizure, on the ground that it was made by prohibition agents rather than agents of the Internal Revenue Department.

As to the propriety of the petitioner's practice, it is justified by United States v. Specified Quantities of Intoxicating Liquors, etc. (C. C. A.) 7 F.(2d) 835.

Since from the foregoing it appears that the attachment was illegal, it will be vacated, and since the seizure of the res falls, the libel must fall. United States v. Lot of Wine (D. C.) 31 F.(2d) 495.

Settle order on notice.